IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CRAIG CUNNINGHAM                    :

                                :

     v.                        :   Civil Action No. DKC 18-3486

                                :

DEBORAH S. LESTER, et al.          :

                                :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this case brought under the Telephone Consumer Protection Act ("TCPA"), 28 U.S.C. § 227, is the motion to dismiss filed by Defendants Deborah S. Lester, Naomi E. Johnson, and Jessica Jolliffe (collectively, the "Individual Defendants"). (ECF No. 27). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted.

## I.  Background

Unless otherwise noted, the facts outlined here are set forth in the corrected first amended complaint and construed in the light most favorable to Plaintiff.

In April 2013, General Dynamics Information Technology, Inc. ("GDIT") became party to a contract with the Center for Medicare and Medicaid Services ("CMS"). Under that contract, GDIT was to make calls to consumers to inform them about their ability to buy

health insurance through the exchanges created by the Affordable Care Act ("ACA"). During the period of January 1, 2015 through May 16, 2016, when GDIT was making the calls that form the basis of this action, Ms. Lester served as CMS's "Contracting Officer" with respect to the GDIT contract, Ms. Johnson worked as the deputy director of CMS's Call Center Operations group, and Ms. Joliffe worked in that same Call Center Operations group.

In December 2015, the Defendants, as employees of CMS with responsibilities relating to the GDIT contract, instructed GDIT to use an automatic telephone dialing system to reach consumers. Defendants also provided a list of phone numbers and a script to be used for prerecorded and/or artificial voice calls, or "robocalls." GDIT recorded the script and placed the calls, just as it was instructed.

Among the 680,000 consumers alleged to have received calls from GDIT was Craig Cunningham ("Mr. Cunningham" or "Plaintiff"). The message Mr. Cunningham received stated:

> Hello, this is an important message from healthcare.gov. The deadline to enroll in a 2016 health insurance plan is coming soon. You may be able to qualify for financial help to make health insurance more affordable. With financial help, most people can find plans for $75 or less per month. Visit healthcare.gov today to see how much you can save. If you have questions, you can call the health insurance marketplace to talk to a trained enrollment specialist at 1-800-318-2596. That's 1-800-318-2596. We are available 24 hours a day and the call is free.

> Don't forget, the deadline to enroll is
> Tuesday, December 15. If you've already taken
> action, and have 2016 health coverage, please
> ignore this message. Thank you. Goodbye.

Mr. Cunningham did not consent to receiving this message, nor did anyone else who received the message.

Mr. Cunningham responded by suing GDIT in the United States District Court for the Eastern District of Virginia. *Cunningham v. Gen. Dynamic Info. Tech., Inc.*, no 1:16-cv-00545, 2017 WL 1682534, at *2 (E.D. Va. 2017) ("*Cunningham I*"). Mr. Cunningham alleged that GDIT had violated the TCPA. The district court dismissed for lack of subject matter jurisdiction, holding that GDIT was immune under the "*Yearsley*" doctrine [*Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18 (1940)], which "protects federal contractors from both state and federal causes of action . . . [by] set[ting] forth [a] jurisdictional bar to suit." *Id*. at *4. In other words, the court dismissed Mr. Cunningham's case because "GDIT is entitled to sovereign immunity under *Yearsley*." *Id*. at *6.

Mr. Cunningham appealed, and the United States Court of Appeals for the Fourth Circuit affirmed, holding that "the district court did not err in treating *Yearsley* applicability as a jurisdictional bar to suit and granting GDIT's Rule 12(b)(1) motion to dismiss on the basis that GDIT is immune from suit under the

*Yearsley* doctrine." *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 651 (4th Cir. 2018) ("*Cunningham II*").

After failed attempts to 1) have his case reheard *en banc* and, 2) petition the United States Supreme Court for *certiorari*, Mr. Cunningham filed his complaint in this action on November 13, 2018. Mr. Cunningham seeks to bring this case as a class action on behalf of himself and all others similarly situated under rules 23(a) and 23(b)(1-3) of the Federal Rules of Civil Procedure. He alleges that the Individual Defendants violated the TCPA by causing GDIT to make unsolicited robocalls.

On February 26, 2019, the Individual Defendants filed a motion to dismiss, (ECF No. 22), and on March 13, 2019, plaintiff filed an amended complaint and a corrected first amended complaint, (ECF Nos. 23, 24). One day later, Defendants filed this motion to dismiss. (ECF No. 27). On May 8, Plaintiff responded in opposition to the motion, (ECF No. 30), and on May 29, Defendants replied with a memorandum of law in further support of their motion to dismiss, (ECF No. 33). Plaintiff has since requested that the court take notice of two recent Supreme Court decisions potentially bearing on this case. (ECF Nos. 34, 35).

## II.  Standard of Review

A motion to dismiss for lack of subject matter jurisdiction is governed by Federal Rule of Civil Procedure 12(b)(1). Generally, "questions of subject matter jurisdiction must be

decided 'first, because they concern the court's very power to hear the case.'" *Owens–Illinois, Inc. v. Meade*, 186 F.3d 435, 442 n. 4 (4th Cir.1999) (quoting 2 James Wm. Moore, et al., Moore's Federal Practice § 12.30[1] (3d ed.1998)). The plaintiff always bears the burden of proving that subject matter jurisdiction properly exists in federal court. *See Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir.1999). In considering a Rule 12(b)(1) motion, the court "may consider evidence outside the pleadings" to help determine whether it has jurisdiction over the case before it. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir.1991); *see also Evans*, 166 F.3d at 647. The court should grant such a motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond*, 945 F.2d at 768. Because the court finds that subject matter jurisdiction is lacking, it is not necessary to address directly Plaintiff's purported failure to state a claim.

**III. Analysis**

In their motion to dismiss, Defendants raise three arguments: 1) that "Plaintiff is Precluded from Relitigating Facts or Issues That were Actually and Necessarily Decided in *Cunningham I and II*[,]" (ECF No. 27-1, at 10),[1] 2) "The TCPA Does Not Provide Subject

---

[1] Citations to page numbers in the parties' papers are to ECF-generated pages.

Matter Jurisdiction for Plaintiff's Claims[,]" (*Id*. at 11), and 3)
"The Defendants are, Alternately, Entitled to Qualified
Immunity[,]" (*Id*. at 19).

## A. Collateral Estoppel

Defendants first argue that under "[t]he doctrine of
collateral estoppel, a subset of res judicata," Plaintiff is
precluded from relitigating issues previously decided in
*Cunningham I* and *II*. (ECF No. 27-1, at 10-11). Defendants suggest
that those cases held:

> (1) The United States cannot be sued under the
> TCPA; (2) The PPACA directs CMS to establish
> a system to keep applicants informed about
> their eligibility for enrollment in a
> qualified health plan; 3) CMS contracted with
> GDIT to carry out this statutory mandate; and
> (4) CMS validly conferred the authorization
> for GDIT to make the phone calls pursuant to
> its statutory mandate to administer the PPACA
> and keep applications [sic] informed about
> their eligibility for enrollment in a
> qualified health plan.

(*Id*. at 11). Plaintiff, however, does not actually attempt to
relitigate any of these issues in any meaningful way – at least as
those facts and issues apply to Defendants' entitlement to
sovereign immunity. Collateral estoppel is therefore irrelevant.

## B. Sovereign Immunity

The government of the United States enjoys sovereign immunity
from suit unless it expressly waives such immunity. *United States
v. McLemore*, 45 U.S. 286, 288 (1846). It is undisputed that the

United States has never waived its immunity to TCPA suits. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016). *Campbell-Ewald* and *Cunningham II* also establish that federal contractors are not inevitably and unqualifiedly immune from TCPA liability. Rather, *Campbell-Ewald* stands for the proposition that "[w]hen a contractor violates both federal law and the Government's explicit instructions. . . no 'derivative immunity' shields the contractor from suit by persons adversely affected by the violation." *Cunningham II* affirms the proposition that "there is no liability on the part of the contractor who simply performed as the Government directed." *Cunningham II*, 888 F.3d at 646.

What is left unsaid in *Cunningham II* and *Campbell-Ewald* is that, for the reasons discussed below, those Government agents who do the "directing" are also immune when it comes to the TCPA, "[f]or the sovereign can act only through agents," *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688 (1949), and "[a]t some level of authority, there must be an official whose acts reflect governmental policy," *Bowen v. Watkins*, 669 F.2d 979 (5th Cir. 1982).

The court's first task is to determine whether the complaint – despite naming Defendants in their individual capacities – "nonetheless effectively states a claim against [the federal government] itself." *See Martin v. Wood*, 772 F.3d 192, 195-96 (4th Cir. 2014). In other words: is Mr. Cunningham seeking to evade

the sovereign immunity bar by holding individuals responsible for "acts [which] reflect governmental policy"?

"Resolution of this issue requires us to look beyond the form of the complaint and the conclusory allegations against [named Defendants] to determine who is the 'real, substantial party in interest.'" *Id*. (citing *Pennhurst State Sch. & Hop. V. Halderman*, 465 U.S. 89, 101 (1984)). In this analysis, Plaintiff's recitation of the words "individual capacity" carries little weight: "the mere incantation of the term 'individual capacity' is not enough to transform an official capacity action into an individual capacity action.'" *Lizzi v. Alexander*, 255 F.3d 128, 136–37 (4th Cir. 2001), overruled in part on other grounds by Nev. Dep't of Human Res. V. Hibbs, 538 U.S. 721 (2003); *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997) ("The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading.") Rather, as both parties agree, some deeper level of analysis is required.

Mr. Cunningham contends that the analysis is simple: "The critical inquiry is who may be legally bound by the court's judgment. Because lawsuits for damages against government employees in their individual capacities do not require actions by the sovereign or disturb the sovereign's property, such lawsuits are not barred by sovereign immunity." (ECF No. 30, at 14) (internal citations and quotations omitted). In his view, without

8

proposed injunctive relief which would operate against the government or damages that would flow directly from the public treasury, there can be no sovereign immunity. (*Id*. at 14-17).

The Defendants suggest there is a bit more nuance when it comes to determining the "real party in interest," but essentially agree with Plaintiff's understanding of the law. That is, Defendants agree that the ultimate *effect on the government* – be it injunctive relief or damages – is the decisive factor. Defendants just believe that this factor cuts the other way, because a judgment against the Individual Defendants 1) would, much like an injunction, effectively bar the government from using robocalls, and 2) would therefore cause the government to pursue a more expensive course, thus cutting into the public treasury. (ECF No. 27-1, at 11-16).

### 1. *Martin* **remains good law**

In resolving this dispute, it is first necessary to analyze whether the decision of the Supreme Court in *Lewis v. Clarke*, 137 S. Ct. 1285 (2017), overturned the Fourth Circuit's decision in *Martin*, 772 F.3d 192. Mr. Cunningham argues that the Court's latest discussion of "individual capacity" suits in *Lewis v. Clarke* is the sole authority for determining who is the "real party in interest." In that case, the plaintiffs sued William Clarke, an employee of the Mohegan Tribal Gaming Authority ("Gaming Authority"), for his tortious conduct in crashing his vehicle in

the course of his employment. *Id*. at 1286. The Gaming Authority, an instrumentality of the Mohegan Tribe of Indians of Connecticut ("the Tribe"), was entitled to Tribal Immunity, a form of sovereign immunity. *Id*. at 1289. The Supreme Court, however, held that Clarke, the Tribe's employee, was *not* entitled to the same sovereign immunity for torts committed in the scope of his employment. *Id*. at 1294.

Two issues were addressed in *Lewis*, (1) whether the tribe's immunity barred individual capacity claims against a tribal employee for torts committed within the scope of their employment, and (2) whether an indemnification clause would change the court's sovereign immunity analysis. After concluding that, under ordinary analysis, the employee was the real party in interest, and thus not entitled to sovereign immunity, the Court turned to the indemnification clause. The Tribe had agreed to indemnify Clarke, and this, he argued, meant that any damages he would be forced to pay would ultimately come out of the public treasury. For a number of reasons, the court found that "[a]n indemnification statute such as the one at issue here does not alter the analysis." *Id*. In so doing, the Court noted that "[t]he critical inquiry is who may be legally bound by the court's adverse judgment, not who will ultimately pick up the tab." *Id*. at 1292-93. Because *Clarke* – not the Tribe – would be legally liable, regardless of whether the Tribe might ultimately pay him back, the suit was rightly

understood as an individual capacity suit, not as an official capacity suit. *Id.*

Plaintiff suggests that because that was "the critical inquiry" in *Lewis v. Clarke*, so too is it "the critical inquiry" in this case – and, as Plaintiff would seemingly have it, in all cases. But there is no reason to conclude that *Lewis v. Clarke*, a case of first impression regarding indemnification statutes, fundamentally altered the law of sovereign immunity.

In order to determine if sovereign immunity applies, courts must ask whether lawsuits brought against employees "represent only another way of pleading an action against an entity of which an officer is an agent[.]" *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). If the court answers that question in the affirmative, then the action is an *official* capacity action, and the individual employee is entitled to sovereign immunity. *Id.* Who will ultimately incur legal liability is certainly an important factor in such an inquiry. And in cases like *Lewis*, where defendants try to use indemnification unduly to expand sovereign immunity "beyond what common-law sovereign immunity principles would recognize for either state or federal employees," *Lewis*, 137 S. Ct. at 1292, it is indeed "the critical inquiry."

Mr. Cunningham asserts that he "is seeking only monetary damages against Defendants in their individual capacities," and that only the individual Defendants – and not the federal

11

government itself – would be legally bound by any ultimate judgment of this court, thus avoiding the bar of sovereign immunity. Plaintiff's understanding of sovereign immunity, however, is far too restrictive. To accept his formulation would be to create an exception that would swallow up the rule. Sovereign immunity "represents a real limitation on federal courts' federal question jurisdiction," *Couer d'Alene*, 521 U.S. at 270, not just a means of protecting the federal government from directly paying out damages awards. Under Plaintiff's reading of *Lewis*, any time the federal government took any action that could hypothetically give rise to a lawsuit, federal courts would *always* have subject matter jurisdiction; that jurisdiction would just extend exclusively to the agents or employees tasked with carrying out the action in question because "the sovereign can act only through agents," *Larson*, 337 U.S. at 688. Far from serving as "a real limitation" on federal question jurisdiction, sovereign immunity would cease to be any limitation at all. *See Lizzi*, 255 F.3d at 137-38.

*Lewis v. Clarke* stands only for the proposition that "who may be legally bound by the court's adverse judgment" is "the critical inquiry" in cases where defendants seek to extend sovereign immunity using indemnification provisions. In other contexts, "who may be legally bound by the court's adverse judgment," remains an important piece of the analysis – but, critically, just a piece.

The Fourth Circuit's opinion in *Martin v. Wood* comports perfectly with that reading of *Lewis*. In *Martin*, the Fourth Circuit listed "(3) would a judgment against the state officials be institutional and official in character such that it would operate against the State" as one of the five factors for determining the "real, substantial party in interest." *Martin*, 772 F.3d at 196 (citing *Pennhurst*, 465 U.S. at 108). Rather than overturning *Martin*, *Lewis* explained a situation where *one of several* factors becomes *the* decisive factor. That, however, is not the situation this court is currently faced with.

## 2. *Martin* applies to the instant case

*Martin v. Wood* was a case under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201-219. There, the plaintiff, a registered nurse formerly employed by a state-operated hospital, sued two of her state employee supervisors for violation of the FLSA. *Martin*, 772 F.3d at 193. The plaintiff there, as here, exclusively sought damages from individual defendants. *Id*.

The court in *Martin* listed five factors for determining the "real, substantial party in interest":

> (1) were the allegedly unlawful actions of the state officials "tied inextricably to their official duties," *Lizzi*, 255 F.3d at 136; (2) if the state officials had authorized the desired relief at the outset, would the burden have been borne by the State, *cf. Pennhurst*, 465 U.S. at 109 n. [1]7, 104 S.Ct. 900; (3) would a judgment against the state officials be "institutional and official in character,"

13

> such that it would operate against the State, *id*. at 108, 104 S.Ct. 900; (4) were the actions of the state officials taken to further personal interests distinct from the State's interests, *id.*; and (5) were the state officials' actions ultra vires, *id*. at 111, 104 S.Ct. 900; *Lizzi*, 255 F.3d at 136.

The Fourth Circuit in *Martin* derived a number of these factors from an earlier case, *Lizzi v. Alexander*, 25 F.3d 128 (4ᵗʰ Cir. 2001).

*Lizzi* dealt with the violation of yet another federal statute, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 et seq. (1994). Again, the plaintiff there sought damages *only* from government employees. *Id*. at 131. The plaintiff in *Lizzi* also sought "an order prohibiting the defendants from violating the FMLA." *Id*. The Fourth Circuit noted that "[o]nly States and state officers acting in their official capacity are immune from suits for damages in federal court." *Id*. at 136 (citing *Buckhannon Board & Home Care, Inc. v. West Virginia Dept. of Health and Human Resources*, 531 U.S. 1004) (2001)).

The complainants in *Lizzi* were, admittedly, either less careful or less sophisticated than Mr. Cunningham, and opened themselves up to certain sovereign immunity pitfalls. For one, they sought injunctive relief. *Id*. at 131. For another, they included a government entity as one of the parties, *id*. at 136, perhaps alerting the court to the real party in interest. Finally, plaintiffs in *Lizzi* failed to use the magic words "individual

capacity" when naming individual defendants. *Id.* None of these pitfalls, however, were ultimately decisive and thus do not meaningfully distinguish *Lizzi*'s analysis from that of the instant case.

In *Lizzi*, the Fourth Circuit found two circumstances which were critical to its finding that the government was the real party in interest. First:

> the allegations in the complaint recounted how WMATA as an agency decided to fire Lizzi. Any actions of the individual defendants were tied inextricably to their official duties. For example, the complaint recounted that "WMATA told [Lizzi]" that he was under investigation after "defendant Alexander, WMATA's Absenteeism Supervisor, recommended in writing to defendant Kurtz, WMATA's Bus Maintenance Superintendent, that plaintiff be terminated." The complaint made no showing of any ultra vires action taken by any individual employee.

*Id.* Second:

> To hold that individual supervisors, as "employers," may be sued under the statute while also holding that the Constitution prohibits the state itself from being sued would undermine the Supreme Court's decisions in *Garrett*, *Kimel*, and *Seminole Tribe*. Plaintiffs like Lizzi would easily be able to evade the Eleventh Amendment prohibition against suing a state merely by naming the individual supervisor as the employer. We refuse to create such an anomaly. The state would still suffer the indignity of having each discrete decision regarding personnel or organizational matters subject to second-guessing by a federal court. "The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics

of captions and pleadings." *Coeur d'Alene*, 521
U.S. at 270, 117 S.Ct. 2028.

> A rule permitting such individual liability
> would do nothing more than "adhere to an empty
> formalism and [would] undermine the principle,
> reaffirmed ... in *Seminole Tribe*, that
> Eleventh Amendment immunity represents a real
> limitation on a federal court's federal-
> question jurisdiction." *Id.* Because WMATA
> enjoys Eleventh Amendment immunity for claims
> brought under the FMLA, the individual
> supervisors under the FMLA are protected by
> that same immunity. *See Beebe*, 129 F.3d at
> 1288-89 (individual supervisors of WMATA have
> immunity for alleged wrongful termination of
> employee). WMATA's Eleventh Amendment
> immunity transfers to the supervisors because
> the individuals were sued in their official
> capacities for their official acts.

(*Id.* at 137-38).

The same reasoning applied in *Martin*, and the same reasoning
applies in the instant case. The Fourth Circuit in *Martin*
distilled *Lizzi*'s first point down to two factors: 1) were the
actions of the individual tied inextricably to their official
duties, and 2) were the government officials' actions *ultra vires*.
*Martin*, 772 F.3d at 196.

The second point, however, applies with even greater force,
as discussed above. To put it in the terms of this case, under
Plaintiff's reasoning, "[t]he [government] would still suffer the
indignity of having each discrete decision regarding [the TCPA]
subject to second-guessing by a federal court." *Id.* Again, this
is not to say such a regime would create binding legal liability

on the government; rather, it is to say that Plaintiff's understanding of "real party in interest" analysis would destroy sovereign immunity's limitation on federal question jurisdiction.

Mr. Cunningham argues that in two post-*Lewis* cases, the Fourth Circuit did not utilize the factors laid out in *Martin* and derived from *Lizzi*. (ECF No. 30, at 17, 18 n. 2). The first of those cases was *Allen v. Cooper*, 895 F.3d 337 (4th Cir. 2018). According to Mr. Cunningham, in *Allen*, "the Fourth Circuit did not utilize the *Martin* test to determine whether sovereign immunity barred the portion of the lawsuit against state officials . . . Rather, the Court went directly to discussing whether the individual Defendants had legislative and/or qualified immunity defenses to the lawsuit." (ECF No. 30, at 17-18).

Plaintiff misreads the case. Far from going "directly to discussing" personal immunities, that opinion devotes nine pages – pages 347 to 355 – to sovereign immunity and does not discuss *Martin* in the process because none of the *Martin* factors were at issue. Rather, the only arguments against sovereign immunity in *Allen* were whether 1) the state had waived sovereign immunity, 2) Congress had abrogated the state's sovereign immunity, and 3) whether the *Ex Parte Young* exception to sovereign immunity applied. *Allen*, 895 F.3d at 347-55.

Plaintiff next asserts, (ECF No. 30, at 18 n. 2), that in the other post-*Lewis* Fourth Circuit case, *Adams v. Ferguson*, 884 F.3d

219 (4th Cir. 2018), the Fourth Circuit "ruled that the test was *inapplicable* to the case before it." But *Adams* was a 42 U.S.C. § 1983 case. As it had in *Lizzi*, the Fourth Circuit noted the distinction between determining the real party in interest in § 1983 cases as opposed to cases dealing with distinct federal statutes like the FSLA and the FMLA. *Adams*, 884 F.3d at 225-26; *Lizzi*, 255 F.3d at 137. Specifically, in *Lizzi*, the court reasoned that because "the FMLA is focused on creating a set of statutory entitlements in its own right," analysis of sovereign immunity in the FMLA context had to be different from the § 1983 context because unlike the FMLA, "§ 1983 is intended as a broad enforcement vehicle to bring suit against state officials for violations of all other federal statutory and constitutional rights. . . Moreover, the text of the FMLA does not contain the well established system of immunities which § 1983 defendants can assert." *Id*. *See also*, *Buxton v. Kurtinitis*, 2015 WL 3937930 at *6 (D. Md. June 25, 2015) (noting distinction between § 1983 and other federal statutes for purposes of sovereign immunity analysis).

*Martin* is in fact the binding and decisive precedent in this case. Unlike in *Lewis*, "who may be legally bound by the court's adverse judgment" is *not* "the critical inquiry." It is one of several inquiries, but, under the circumstances of this case, it is not in and of itself decisive. By the same token, far from

being overturned and abrogated by *Lewis*, certain of the *Martin* factors have magnified importance in the instant case.

### 3. Applying the *Martin* factors

Clearly the Individual Defendants' actions were "tied inextricably to their official duties." To the extent there are any specific allegations regarding Ms. Lester's actions, they are as follows: she "served as CMS's 'Contracting Officer' with respect to the CMS-GDIT contract[,]" and "authorized a modification to the CMS-GDIT contract that directed GDIT to use an automatic telephone dialing system[.]" (ECF No. 23, at 3). As a "contracting officer," there can be no doubt that such action was "inextricably tied to her official duties." As for Ms. Johnson, it is alleged that she "supervised the employees who managed the operations of 1-800-MEDICARE and the Healthcare Marketplace Call Center." (*Id.*). Again, as the deputy director of CMS's Call Center Operations Group, this activity was "tied inextricably to her official duties." As for Ms. Jolliffe, it is only alleged that she "worked at the CMS Call Center Operations Group." (*Id.*)

The second factor is "if the state officials had authorized the desired relief at the outset, would the burden have been borne by the state?" In context, this factor focuses on any requested injunctive relief, and not damages. The case cited in *Martin* for this factor is *Pennhurst*, 463 U.S. at 109, n. 17, at which point the Court was considering injunctive relief and whether it was

"institutional and official in character."  In this case, Mr. Cunningham deliberately limited his "desired relief" to statutory damages, which he seeks to be paid by the Individual Defendants. But this factor and "desired relief" can't be read so narrowly. His "desired relief" clearly is a verdict finding that the use of robocalls to implement the CMS contract violates the TCPA, entitling him to damages.  While he eschews the intent to seek an injunction, if damages are awarded in this case, no employee of CMS would participate in any further implementation of a contract involving robocalls and would not participate in any such other contract in the future.  The desired relief would be the abrogation of the contract and the cessation of robocalls.[2]  That burden would fall directly on the Government.

Again, as to the third factor, the term "judgment" must be applied logically.  It is true that, despite Defendants' arguments to the contrary, a monetary judgment against the state officials would not necessarily be institutional and official in nature such that it would operate against the government.  Damages would only

---

[2] Notably, Plaintiff asserts "[u]pon information and belief," that such robocalls were occurring "through the date of the filing of this First Amended Complaint[.]"  (ECF No. 23, at 6).  CMS continues to use robocalls.  *See* Ctr. For Medicare & Medicaid Serv., *Federal Health Insurance Exchange 2020 Open Enrollment*, https://www.cms.gov/newsroom/fact-sheets/federal-health-insurance-exchange-2020-open-enrollment (last visited Jan 17, 2020).  Any interference with public administration resulting from a cessation of robocalls, then, would be real and not just hypothetical.

be levied against the Individual Defendants.  And, as we know, indemnification would not change anything.  *Lewis*, 137 S. Ct. at 1294.  But, the *Martin* court cited to the same section of *Pennhurst* for this factor, implying that the true impact on the government should be assessed.

Finally, combining the last two factors, we must ask whether the officials' actions were either *ultra vires* or taken to further personal interests as opposed to those of the government.  These factors, like the "inextricably tied to their official duties" factor, all ask much the same question: was the official exercising discretion to such a degree that she was acting outside her authority, outside the duties of her job, or for herself as opposed to her employer.

Importantly, in determining the scope of Defendants' authority, we do not ask "did the Defendants have the authority to direct GDIT to violate the TCPA?"  Rather, we ask "did the Defendants have the authority to instruct GDIT as to how to communicate with customers?"  On this point, *Cunningham II* is instructive: there, the Fourth Circuit noted that "[t]he purpose of *Yearsley* immunity is to prevent a government contractor from facing liability for an alleged violation of law, and thus, it cannot be that an alleged violation of law per se precludes *Yearsley* immunity." *Cunningham II*, 888 F.3d at 648–49.  Likewise, the purpose of "official capacity" sovereign immunity is to prevent

an official acting within his or her authority from facing liability for an alleged violation of law, and thus, it cannot be that an alleged violation of law per se precludes "official capacity" sovereign immunity. Just as *Cunningham II* held that "Congress had the authority to assign GDIT to complete [the] task [of informing consumers regarding healthcare enrollment]," this court now holds that the Individual Defendants had the authority to instruct GDIT as to how to carry out that task.

Analysis of the *Martin* factors leads to the conclusion that the real party in interest is the United States, and thus that Individual Defendants are entitled to sovereign immunity. Therefore, the court lacks subject matter jurisdiction to hear this case. Because the court lacks subject matter jurisdiction, it need not address the issue of qualified immunity nor the arguments for dismissal based on failure to state a claim.

**IV. Conclusion**

For the foregoing reasons, the motion to dismiss filed by the Individual Defendants will be granted. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
